Alexandria

## MARTHA E. GUBA

v.

## COMMONWEALTH OF VIRGINIA

No. 0364-88-4

Decided September 19, 1989

COUNSEL

Thomas J. Morris, Sr., for appellant.

Thomas C. Daniel, Assistant Attorney General, (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**DUFF, J.**—Martha E. Guba appeals her conviction by a jury of the willful or knowing failure to provide necessary care for Ashley (spelled Ashleigh in the indictment) Snead, while in her charge, so as to cause or permit the child's life or health to be seriously injured, in violation of Code § 18.2-371.1.[1] She raises two points on appeal: (1) whether the trial court erred in failing to grant a mistrial or other appropriate relief due to the Commonwealth's failure to comply with a discovery order, and (2) whether the trial court erred in refusing to allow defense counsel to show bias and prejudice on the part of a Commonwealth witness. From our review of the record, our consideration of the briefs filed and the able arguments presented, we conclude that the Commonwealth failed to provide defendant with the discovery intended by the pretrial order, with resulting prejudice to the extent meriting a new trial. As the second point is not necessary to our disposition of the case on appeal, we do not address it.

Martha E. Guba, age fifty-eight, operated a child care facility out of her home in Springfield, Virginia. She had cared for Ashley Snead five days a week for a number of months. On Monday, July 27, 1987, Ashley, who was then ten months of age, was brought to Mrs. Guba, as was the usual custom. As far as the record reveals, nothing untoward occurred that day. On Tuesday, July 28, 1987, Ashley was delivered at approximately 7:15 a.m. At 10:30 a.m., Mrs. Guba telephoned Ashley's mother and advised her that the child may have swallowed one Tylenol and that she was concerned about her welfare. Apparently, in the ensuing several hours there were one or two additional telephone calls about Ashley's condition. There was evidence that Mrs. Snead advised Mrs. Guba that

---

[1] Code § 18.2-371.1 provides, in pertinent part: "Any parent or other person responsible for the care of a child under the age of eighteen who by willful act or omission or by refusal to provide any necessary care for the child's health causes or permits the life or health of such child to be seriously injured shall be guilty of a Class 5 felony."

she had checked with her doctor, who told her that one Tylenol was probably harmless but to keep an eye on the child. In the meantime, Ashley had been "put down" for a nap. At 1:30 p.m., Mrs. Guba noticed that the baby was perspiring. Checking later, she found her to be limp and not breathing. Mrs. Guba then called the "911" emergency number. Ashley was rushed to the emergency room of Fairfax Hospital, where she was pronounced dead. The diagnosis was infant sudden death syndrome.

On July 29, 1987, an autopsy was performed by Dr. Francis P. Field, which revealed imipramine poisoning as the cause of death. Imipramine is contained in the prescription drug Tofranil and for all practical purposes, the record reveals the two terms are used interchangeably. Police Investigator Healey told Mrs. Guba that the child had died from imipramine poisoning; Guba then gave the officer a Tofranil pill, which she stated she had just found under the microwave oven. The record further shows that Mrs. Guba stated she was not under a doctor's care, but that Tofranil had been given to her husband years ago in Atlanta. She also said she had thrown the Tofranil out a week before the tragedy; she then stated that the pills were thrown away on Monday or Tuesday. Ashley died on Tuesday, July 28, 1987.

At trial, Dr. Henry Horn, a family practitioner, testified that he had prescribed inderal, cafergot and mepergan fortis for Mrs. Guba in March, 1986. She was given valium and 30 doses of Tofranil in June, 1986. The evidence further showed that Guba had received 100 doses of Tofranil on July 5, 1986, and various refills of the prescription up until the time of Ashley's death.

Prior to trial, various motions were filed and argued, one being a motion for discovery. After argument, a written order dated December 11, 1987, was entered, which provided, in pertinent part: "It is further adjudged that the Commonwealth supply the defendant with the time of the alleged offense as accurately as they are able to determine." This language was included in handwriting at the end of the order, initialed by the Court, pursuant to a ruling upon the request of the defense that the Commonwealth furnish information as to the time it was contended that the imipramine was ingested. A review of the transcript of the argument and the court's oral ruling leaves no doubt that the court intended that the Commonwealth would furnish any information available to it regarding the ingestion of the drug at "any time

other than the time the child got there and left" on July 28. The Commonwealth's response was that the offense had occurred on July 28, 1987. At trial, Dr. Anhn Huynh, a forensic toxicologist, testifying as a Commonwealth's witness, expressed the opinion that the imipramine had been ingested over a period of time, around three days or even longer. He described Ashley's condition as chronic, rather than acute intoxication, and expressed the opinion that between six to nine tablets had been ingested on the last day of the child's life.

Defense counsel argued that after receipt of the Commonwealth's response to discovery, he consulted a pathologist at Arlington Hospital regarding the need for expert testimony. He was advised that if "it happened on that date, then that is the date you are stuck with and that is where you will have to work from."

Mrs. Guba contends that she was led to believe, and prepared her defense against, the Commonwealth's proof of ingestion of imipramine on one day, July 28. However, the Commonwealth was allowed to introduce evidence of chronic drug intoxication over a period of three days or longer. She points out that she cared for Ashley the day preceding her death, Monday, July 27, but did not have the child on the previous Sunday or Saturday. She argues that she was misled and prejudiced in the preparation of her defense by the discrepancy between the information furnished on discovery and Dr. Huynh's testimony at trial. She asserts that her motion for a mistrial, or at least her motion to strike Dr. Huynh's testimony, should have been granted.

The Commonwealth responds that Mrs. Guba was not on trial for the killing of Ashley Snead, only for neglect that resulted in her death. They argue that the neglect occurred only on July 28, under the theory that Mrs. Guba should have sought immediate medical attention and assistance for the child. They argue further that the written discovery order required only disclosure of the date of the offense, which was furnished, not the date of ingestion of the Tofranil. They contend that the testimony of Dr. Huynh of three or more days of ingestion was relevant because of the probable symptoms of distress that would ensue, which should have alerted Mrs. Guba to a heightened awareness of the need to summon medical assistance. Finally, the Commonwealth asserts that no objection was made by defense counsel when the doctor's testimony was first offered, but only sometime later after the luncheon

recess.

■ There exists no constitutional right to discovery in a criminal case in Virginia. However, Rule 3A:11 of the Rules of the Supreme Court of Virginia provides for limited pre-trial discovery by an accused in a felony case. The usual practice in the Commonwealth is for the court to enter a pre-trial order for discovery and inspection, as was done in this case. However, in some instances the discovery provided for in the Rule is furnished voluntarily, and an order is not entered. The difficulty presented in this case is the difference between the scope of discovery intended by the remarks of the pre-trial judge and the discovery provided in the handwritten language appended at the end of the pre-trial order. The first required the Commonwealth to state the dates of ingestion of Tofranil; the other the date of the offense for which the accused was indicted. While the two dates are not mutually exclusive, we find from examining the record that the court intended that the dates of ingestion be disclosed, whether those dates were the same or different from the date upon which the Commonwealth alleges the crime occurred. Thus, there was a failure to comply with the intent of the court's pre-trial ruling.

■ We are not unmindful that generally a court speaks through its written orders. We are constrained not to depart from this salutory rule. However, where the record clearly establishes what was intended, we must give force and effect to that intent rather than rely solely on precise and technical wording of the court's written order. This is not a case where the written order changed or negated the oral ruling. As indicated, the two are not mutually exclusive. Nor are we unmindful that the admission of relevant and material evidence in violation of a discovery order is not reversible error in the absence of a showing of prejudice. *Stotler v. Commonwealth*, 2 Va. App. 481, 484, 346 S.E.2d 39, 40 (1986). Under the circumstances of this case, we hold that the defense was prejudiced when, for the first time, evidence was produced that ingestion had occurred over a period of three days or longer.

We cannot say that the admission of such evidence was harmless error. The preparation of the defense was focused on a one day ingestion of Tofranil. What additional defenses, if any, might have been developed by expert testimony, we cannot say, but the defendant had the right to have this information so that a full investigation and effort could be exhausted to determine such pos-

sible defenses.

Also, the evidence not provided on discovery might well have had an impact on the punishment recommended by the jury. As the trial judge noted during the argument on the mistrial motion, Dr. Huynh's testimony conveyed at least the surmise that Mrs. Guba had, in fact, "fed that child tablets over a period of time." For these reasons, we hold that the defendant's motion for a mistrial, or at least to strike Dr. Huynh's testimony, should have been granted.[2]

Accordingly, the judgment of conviction is reversed and the case remanded for a new trial, if the Commonwealth be so advised.

*Reversed and remanded.*

Koontz, C.J., and Benton, J., concurred.

---

[2] *See* Code § 19.2-265.4; Rule 3A:11(g).